UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 4:21-cr-00035-SEP ) |
| ZACHARY HOVIS, | ) ) ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM**

Defendant, Zachary Hovis ("Hovis"), by and through counsel, and files the following memorandum for sentencing.

**I.      Background**

On January 21, 2021, the government filed a two-count Indictment, alleging that on November 16, 2019, Hovis distributed fentanyl to C.W. and C.H. in violation of Title 21, U.S.C. § 841(a)(1). *See* Indictment [Doc. Text # 1]. On June 14, 2024, pursuant to a written plea agreement, Hovis pled guilty to two counts of Distribution of Fentanyl. *See* Presentence Investigation Report at ¶¶ 1-2 [hereinafter "*PSR*"]. Pursuant to the written agreement, the parties agreed to request a sentence within the jointly recommended sentencing range of 60 months to 168 months. *See* PSR at ¶ 3. On August 26, 2024, the probation office filed its PSR and calculated therein a total offense level of 39, a criminal history category of I, and advisory guideline range of 262 to 327 months. *See* PSR at ¶¶ 36, 40, and 65. However, given Hovis' history of addiction, beginning when he was 16 years old, the facts and circumstances of the offense, and his pretrial and post-plea conduct, Hovis respectfully suggests that a sentence in the range of 84 to 120 months is appropriate.

1

## II. The Nature and Circumstances of the Offense

Hovis and C.W.'s relationship began as young kids. They would sit together on the bus, walk together in the halls at school, and spent much of their free time together. Hovis and C.W. both attended Francis Howell High School. By fall of 2016, they started regularly hanging out and using marijuana together after school. Towards the end of high school, Hovis and C.W. had a very on and off again kind of friendship. By the time of graduation in spring of 2018, Hovis and C.W. were not seeing each other very often. They did not start to hang out again until June of 2019. At that time, Hovis was in the throes of his battle with addiction, using fentanyl almost every hour. One day while they were hanging out, Hovis was using fentanyl in front of C.W. She asked if she could try, to which Hovis obliged. That progressed to Hovis and C.W. traveling to St. Louis City together to pick up more drugs.

On November 16, 2019, Hovis and C.W. arranged to meet at the Whitmoor Country Club in St. Charles, Missouri to conduct a drug transaction. Hovis provided C.W. with a capsule which they both snorted at the country club. Following the transaction, C.W. left Whitmoor Country Club and drove to a Dobb's Tire and Auto. About an hour and fifteen minutes after Hovis and C.W. are seen in surveillance footage at Whitmoor Country Club, C.W. was found unconscious in her vehicle in the Dobb's parking lot. Despite life-saving measures attempted by bystanders and emergency personnel, C.W. did not make it. According to the medical examiner's report, C. W's cause of death was determined to be fentanyl intoxication.

Hovis and C.H. both attended Francis Howell High School. They shared many friends in common. However, they were never particularly close. C.H. was aware through mutual friends that Hovis had access to opioids. She had previously purchased opioids from Hovis on at least one prior occasion.

2

On November 15, 2019, C.H. provided Hovis with $20 cash for Hovis to purchase an opioid on her behalf. On November 16, 2019, C.H. met Hovis at his residence to retrieve the opioid. Hovis handed her the opioid and told her to "be careful" as she left. C.H. then headed to a friend's house where she ingested the opioid. C.H. began to feel sick, could not stand up, and started vomiting. C.H.'s friend drove her to SSM Health St. Joseph West Hospital in Lake St. Louis, Missouri where she received treatment and was released the same day.

### III.   Sentencing Rules

Title 18 U.S.C. § 3553(a) requires this Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing. The purposes of sentencing are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2)(A)-(D).

In addition, the factors to consider in connection with the purposes of sentencing are:

> (A) The nature and circumstances of the offense and the history and characteristics of the defendant;
> (B) The kinds of sentences available;
> (C) The guidelines promulgated by the Sentencing Commission;
> (D) Any pertinent policy statement issued by the Sentencing Commission;
> (E) The need to avoid unwarranted sentencing disparities among similarly situation defendants; and
> (F) The need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a)(1)-(7).

The guidelines are only one factor to consider and deserve no greater weight than any other factor. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Thus, this Court may not

presume a sentence within the guideline range is reasonable. *See Rita v. United States*, 551 U.S. 338, 351 (2007). Nor may it presume a sentence outside the guideline range is unreasonable. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Furthermore, this Court may not require "extraordinary circumstances" to justify a sentence below the guidelines nor "use a rigid mathematical formula to determin[e] the strength of the justification required for a specific sentence." *Id.* at ¶ 47. These rules apply regardless of whether the guideline derives from the Unites States Sentencing Commission ('the Commission") or a policy determination of Congress. *See Kimbrough*, 552 U.S. at 109-10.

### IV. Drug Use and Addiction

Some estimate the number of U.S. opioid addicts at 2.1 million.[1] Around 539,000 people aged 12 and older "misused" prescription fentanyl in 2021. There is no estimate of the number of illicit fentanyl users.[2] 71,238 people died from fentanyl overdose that same year.[3]

Why people use drugs is well known: "they want to feel good, stop feeling bad, or perform better in school or at work, or they are curious because others are doing it and they want to fit in."[4] "The last reason," according to the National Institute of Drug Abuse, "is very common among teens."[5]

---

[1] National Institute of Health, National Library of Medicine, National Center for Biotechnology Information, Alexander M. Dydk, Nitesh K. Jain, Mohit Gupta, "Opioid Use Disorder," Introduction, (Last Updates Jan. 17, 2024), available at https://www.ncbi.nlm.nih.gov/books/NBK553166

[2] *See* American Addiction Centers, Fentanyl Misuse Statistics, (updated July 19, 2024), available at https://americanaddictioncenters.org/opiods/fentanyl/addiction-statistics.

[3] *See* Centers for Disease Control, National Center for Health Statistics, "U.S. Overdose Deaths in 2021 Increased Half as Much as in 2020 – But are Still Up 15%" (May 11, 2022), available at https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm.

[4] National Institute of Health, National Institute on Drug Abuse, The Science of Drug Use: A Resource for the Justice Sector, (Nov. 23, 2022), available at https://nida.nih.gov/research-topics/criminal-justice/science-drug-use-resource-justice-sector.

[5] *Id.*

Addiction is also well understood:

"Drug addiction is when you can't stop taking the drug even if you want to. The urge is too strong to control, even if you know the drug is causing harm. The addiction can become more important than the need to eat or sleep. The urge to get and use the drug can fill every moment of your life. The addiction replaces all the things you used to enjoy. A person who is addicted might do almost anything – lie, steal, or hurt people – to keep taking the drug. This can lead to problems with your family and friends, and can even lead to arrest and jail. You can get addicted to illegal drugs as well as prescription drugs if you misuse them. Drug addiction is a chronic disease. That means it stays with you for a long time, even if you stop using it for a while. It doesn't go away like a cold. A person with an addiction can get treatment, but quitting for good can be very hard."[6]

Hovis first used drugs in 2016 when he was 16. By 2019, Hovis was deep in the throes of a severe addiction to opioids, specifically, fentanyl and benzodiazepines. Hovis turned to dealing to close friends, or friends of close friends, to support his growing addiction.

V.      Hovis' History and Characteristics

Zachary Hovis was born on June 1, 2000, in St. Louis, Missouri to Steven Hovis, age 58 and Tara Hovis (nee: Porterfield), age 62 of St. Peters, Missouri. PSR ¶ 43. Hovis' father has been retired since June of 2024 following a successful career in information technology and healthcare. *Id.* His mother was employed at CitiMortgage until Defendant's birth at which point she became a stay-at-home mother. Hovis has two sisters: Makenzie and Ashley.

*Early Life*

By all accounts, Hovis had a relatively normal childhood. He was very close with each of his sisters. While his dad was often at work, both of his parents were very present in his life. He was a straight A student throughout elementary and middle school. He was loved by each of his teachers and his peers. He enjoyed playing soccer in his elementary and middle school years. In fact, he was quite a gifted soccer player at a young age despite being smaller in stature than

---

[6] *Id.*

5

many of his teammates. What he lacked in size he made up for in speed, skill, and determination. When he was in seventh grade, he was selected to participate in an international soccer camp for gifted players in the Netherlands.



In 2013, Hovis was formally diagnosed with depression. He was prescribed medication to treat his depression. However, Hovis never took the medication long enough to allow it to work.

*High School*

Hovis started high school at Francis Howell High School in August of 2014. When he advanced to high school, he found his former soccer teammates dispersed to different schools. He was no longer able to find comfort playing soccer. Eventually, Hovis stopped playing soccer all together. In an attempt to fill the void left from soccer, Hovis began to regularly play video games and live stream to viewers on Twitch.

Initially, Hovis was still academically successful. He earned A's and B's in each of his freshman and sophomore classes. However, that changed during his junior year. In fall of 2016,

to aid in playing video games, Hovis started to use Adderall, which he obtained from a classmate who had a prescription. Around the same time, Hovis began to experiment with marijuana. His marijuana use quickly progressed to daily use after school. Hovis then began to experiment with opioids, benzodiazepines, and psychedelics. Specifically, Hovis began taking Xanax on a regular basis and the addiction started to take root. By spring of 2017, Hovis received his first ever D grade in a class.

By fall of 2017, Hovis' drug use rapidly intensified while his grades continued to drastically decline. Hovis went from being an A and B student to earning mostly F's and D's by the end of his senior year. Hovis managed to graduate high school. However, Hovis went from being a top high school student to graduating with an unweighted GPA of 2.85 and a class rank of 276 out of 423. Following graduation, Hovis enrolled in classes at St. Charles Community College, planning to begin in the fall of 2018.

*The Assault of Hovis*

In August of 2018, Hovis was lured to a park and attacked by a group of eight men. Hovis was repeatedly punched and kicked all over his body. Immediately afterwards, Hovis experienced nausea, vomiting, and black outs. Police were contacted but Hovis did not make a report and refused immediate medical treatment. About a week after the fight, Hovis still experienced physical symptoms and visited a Total Access Urgent Care. He was described as having multiple head injuries, fogged thoughts, fatigue, and bruising to the left orbit. Ultimately, Hovis was diagnosed with a closed head injury and postconcussional syndrome.



The physical injuries suffered in this incident, however, pale in comparison to the mental anguish Hovis experienced in the aftermath. For the next nine months, Hovis refused to leave the house. He spent his days in bed in a dark room, hardly even getting up to shower. Hovis dropped out of community college, stopped communicating with his friends, barely spoke to his family, and reported feeling afraid to leave the house.

In April of 2019, Hovis finally ended his home isolation. He began using Xanax again to numb himself from the mental anguish he still experienced. In June of 2019, Hovis was given what he thought was Xanax. After taking the pill, Hovis experienced a sickness he had never experienced before. What Hovis did not know at the time was that the pill he had been given contained fentanyl, and Hovis was experiencing his first suspected overdose. Following the first overdose incident, Hovis' drug use continued and increased. He began taking multiple capsules of fentanyl every day, depending on the amount of money he had that day. The effects of Hovis' addiction were painfully obvious to his friends and family. Hovis would "nod off" when hanging

8

around others. He became argumentative and cruel. His friends and family often could not understand his speech. He was unrecognizable and withdrawn from friends and family.

 

By the time Hovis reached twenty years in age, he had already experienced at least ten suspected overdoses on fentanyl. His addiction was out of control.

*Road to Recovery*

In January of 2020, two months after the present offense, Hovis was arrested in St. Charles County for possession of fentanyl. On April 29, 2020, Hovis checked himself into the Harris House for in-patient addiction treatment, where he stayed for twenty days. On June 1, 2020, Hovis found a job as a part-time sourcing analyst with HighQuartile. Within that role, Hovis demonstrated integrity, strong work ethic, dependability, and compassion, which lead to the position being converted to a full-time role. He continued to be employed at HighQuartile until his post-plea incarceration in June of 2024. While at HighQuartile, Hovis was known as

9

"Mr. Dependable" and was always eager to assist a coworker or offer support to clients experiencing difficulties during COVID. Hovis was respected and admired by his team and the entire office.

In January of 2021, St. Charles County offered Hovis the opportunity to participate in their drug court program. Successful completion of this program would result in the state-level possession charges being dismissed. On January 12, 2021, Hovis took advantage of the opportunity and began a twenty-month treatment program. Between January 21, 2021 and August 24, 2022, Hovis earned and paid $1,800 of his own money to cover the costs of the treatment program. Hovis passed all 185 drug tests administered, attended 114 group and 14 individual therapy sessions, completed 45 hours of community service, and successfully completed all five phases of the treatment program without issue. Additionally, Hovis had to deal with the added challenge of being served with the arrest warrant for the present offense on January 27, 2021, remaining in federal custody until February 17, 2021. Ultimately, Hovis was able to continue in the drug court program upon pretrial release in the present matter.

On August 24, 2022, Hovis officially graduated from the treatment program and has maintained sobriety until his remand into custody in this case. He has now been sober for 47 months. The St. Charles County possession charge was ultimately dismissed following the successful completion of the drug court program.

At Hovis' graduation ceremony, St. Charles County Circuit Judge Phillip J. Ohlms said:

> "After [Hovis] started with [the treatment program] … [Hovis] had some problems in another court that could have overwhelmed him … He never let that be an excuse and that's really hard … This is a very difficult program for young people and [Hovis] had that additional problem. The fact [he was] able to maintain [his] focus, [he is] graduating today. I am very proud of what [Hovis] has done."

[7]

While on pretrial supervision, Hovis further took it upon himself to seek mental health counseling. On January 26, 2024, Hovis began attending bi-weekly counseling sessions with Dr. Nikki Redecker at The Center for Child and Family Counseling in St. Charles, Missouri. Dr. Redecker diagnosed Hovis with anxiety and post-traumatic stress disorder (PTSD). Subsequently, Hovis was prescribed anti-anxiety medication and medication for PTSD and insomnia. Hovis consistently attended his counseling sessions and maintained his medication regimen up to his post-plea remand.

Since his change of plea hearing on June 14, 2024, Hovis has been incarcerated at the Franklin County Adult Detention Facility in Union, Missouri. In the six months he has been there, Hovis has completed 702 courses, earning 10,002 credits, offered through Pathway to Achieve.[8] Many of the courses Hovis has completed focus on maintaining sobriety, professional

---

[7] The picture above depicts Hovis (right) at his graduation ceremony from St. Charles County drug court with his mother, Tara (middle right), sister, Mackenzie (middle left), and father, Steven (left).

[8] The complete transcript of Pathway to Achieve courses completed is attached to this memorandum.

11

development, personal development, and mental health and wellness. Hovis' determination to remain sober and continue the path of recovery remains even while incarcerated.

VI.     **Conclusion**

In the U.S., drug overdoses claimed an estimated 111,029 lives in 2022.[9] Approximately 76,226 overdosed on fentanyl or some other synthetic opioid.[10] Synthetic opioids took a similar number of lives in 2021 and 2023.[11] Some overdosed on adulterated drugs and did not know they took fentanyl.[12] Others knew what they ingested. Addiction pushed the risk from their minds.

In the last decade, as the fentanyl death toll climbed, distraught families pressed lawmakers to punish those accountable for their losses.[13] In response, some states enacted drug-induced homicide statutes.[14] Others relied on existing laws, like the felony-murder rule, to hold

---

[9] *See* Centers for Disease Control, National Center for Health Statistics, "U.S. Overdose Deaths Decrease in 2023, First Time Since 2018," (May 15, 2024), available at https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2024/20240515.htm.

[10] *See id*.

[11] *See* Centers for Disease Control, National Center for Health Statistics, U.S. Overdose Deaths In 2021 Increased Half as Much as in 2020 – But Are Still Up 15%, (May 11, 2022), available at https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm; see also *See* Centers for Disease Control, National Center for Health Statistics, "U.S. Overdose Deaths Decrease in 2023, First Time Since 2018," (May 15, 2024), available at https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2024/20240515.htm.

[12] *See, e.g.*, Judy L. Thomas and Laura Bauer, "Deadly Dose, Fentanyl has Killed more than 850 in KC Area. Here are the Stories of 26 Lives Cut Short," The Kansas City Star (Nov. 2, 2023) (recounting the stories of 26 Kansas City area residents who overdosed on "a lethal dose of fentanyl their families say they didn't know they were taking"), available at https://www.kansascity.com/news/local/article281002308.html.

[13] *See, e.g.*, Arthur Robin Williams, "From Punishment to Prevention: Revisiting the Failed War on Drugs in the Fentanyl Era," U.S. News & World Report, (Jan. 8, 20224), available at https://www.usnews.com/news/health-news/articles/2024-01-08/from-punishment-to-prevention-revisiting-the-failed-war-on-drugs-in-the-fentanyl-era; Jack Shuler, "Overdose and Punishment," The New Republic, (Sept. 10, 2018), available at https://newrepublic.com/article/150465/prosecutors-reviving-reagan-era-drug-induced-homicide-laws.

[14] *See, e.g.*, Taleed El-Sabawi, Jennifer J, Carroll, and Morgan Godvin, "Drug-Induced Homicide Laws and False Beliefs About Drug Distributors: Three Myths That Are Leaving Prosecutors Misinformed," American Criminal Law Review, Vol. 60, Iss. 4 (2023), available at https://www.law.georgetown.edu/american-criminal-law-review/in-print/volume-60-number-4-fall-2023/drug-induced-homicide-laws-and-false-beliefs-about-drug-distributors-three-myths-that-are-leaving-prosecutors-misinformed/.

the blameworthy accountable.[15] For its part, the federal criminal justice system has long relied on a "death results" guideline,[16] promulgated by the United States Sentencing Commission in conjunction with a 20-year mandatory minimum statute enacted by Congress after the cocaine-induced death of a star basketball player drafted by the Boston Celtics in the first round of the 1986 NBA draft: Len Bias.[17]

These laws have not ensnared those most culpable for the fentanyl epidemic: the 90,000-plus members of the Sinaloa and Jalisco cartels or the 100-plus vendors of fentanyl precursors in China, all of whom remain outside the jurisdiction of the United States and continue their operations unabated. Nor have they caught those who oversee the largest drug trafficking organizations in the U.S. or their highest-ranking members. Instead, they have applied with increasing frequency to addicts and low-level dealers who often share a relationship with the overdose victim—a friend, family member, or co-worker.[18]

---

[15] *See id*.

[16] *See* U.S.S.G. § 2D1.1(a)(2).

[17] *See* Maxine Bernstein, "Fentanyl Overdose Death Leads to Rare Manslaughter Conviction of Drug Dealer In Washington County," The Oregonian, (May 24, 2024), available at https://www.oregonlive.com/crime/2024/05/fatal-fentanyl-overdose-leads-to-rare-manslaughter-conviction-of-drug-dealer-in-washington-county.html.

[18] *See, e.g.,* Eli Saslow, "He Tried To Save a Friend. They Charged Him With Murder," The New York Times. (June 28, 2023), available at https://www.nytimes.com/2023/06/25/us/fentanyl-murder-charge.html; Will McDuffie and Nadine El-Bawab, "Teen Girl Charged with Murder after Classmates Die from Fentanyl Overdose," ABC News. (May 19, 2023), available at https://abcnews.go.com/US/teen-girl-charged-murder-after-classmates-die-fentanyl/story?id=99454523; Jack Shuler, "Overdose and Punishment," The New Republic, (Sept. 10, 2018), available at https://newrepublic.com/article/150465/prosecutors-reviving-reagan-era-drug-induced-homicide-laws.\; Drug Enforcement Administration, "CO-Worker Who Sold His Friend Fentanyl Pills Causing His Death Sentenced to 84 Months in Federal Prison, (June 20, 2024), available at https://www.dea.gov/press-releases/2024/06/20/co-worker-who-sold-his-friend-fentanyl-pills-causing-his-death-sentenced; Paige Williams, "The Wrong Way to Fight The Opioid Crisis, The  New Yorker, (Feb. 3, 2020), available at https://www.newyorker.com/magazine/2020/02/10/the-wrong-way-to-fight-the-opioid-crisis; Joshua Vaughn, "A Pennsylvania Man Survived An Overdose Only To Be Charged with Homicide," The Appeal, (July 24, 2018), available at https://theappeal.org/a-pennsylvania-man-survived-an-overdose-only-to-be-charged-with-homicide/; Rosa Goldstein, "They Shared Drugs. Someone Died, Dose that Make Them Killers?," The New York Times (May 25, 2018), available at https://www.nytimes.com/2018/05/25/us/drug-overdose-prosecution-crime.html.

13

Supporters of drug-induced homicide laws claim they deter fentanyl distribution, hold at least someone accountable when an overdose death occurs, and give solace to families in undeniable despair.[19] Critics contend they represent a throwback to the worst days of a lost drug war, fail to deter fentanyl distribution, discourage users from reporting fentanyl overdoses for fear of prosecution, and punish addicts who are themselves victims of the opioid epidemic.[20]

Supporters and critics of these laws come from all backgrounds: law enforcement, academia, the legal system, and families of overdose victims. And the judges who preside over cases in which these laws apply adopt varying approaches. Some emphasize punishment. Others emphasize rehabilitation. As a result, sentences run the gamut. Some federal sentences land at 2-plus years,[21] and others run to 20 years or more. Many fall somewhere in between.

---

[19] *See, e.g.*, Zachary A. Siegel, "Amid Opioid Crisis, Pennsylvania District Attorneys Advocate for War On Drugs," The Appeal, (Dec. 20, 2017), available at https://theappeal.org/amid-opioid-crisis-pennsylvania-district-attorneys-advocate-for-war-on-drugs-d998afd9416d/.

[20] *See, e.g.,* Arthur Robin Williams, "From Punishment to Prevention: Revisiting the Failed War on Drugs in the Fentanyl Era," U.S. News & World Report, (Jan. 8, 20224), available at https://www.usnews.com/news/health-news/articles/2024-01-08/from-punishment-to-prevention-revisiting-the-failed-war-on-drugs-in-the-fentanyl-era; "U.S. States Get Tough with 'War on Drugs'-Era Laws to Takle Fentanyl Crisis," The Guardian (2023), available at https://www.theguardian.com/us-news/2023/jul/25/lawmakers-drug-laws-fentanyl-charges; Walker Milligan, ""OKC Police and DA's Approach to Overdoses Appears to be Punishment over Prevention," The Oklahoman, (May 21, 2023), available at https://www.oklahoman.com/story/opinion/2023/05/21/guest-approach-to-overdoses-appears-to-be-punishment-over-prevention/70211839007/; Tallied El-Sabawi, Jennifer J, Carroll, and Morgan Godvin, "Drug-Induced Homicide Laws and False Beliefs About Drug Distributors: Three Myths That Are Leaving Prosecutors Misinformed," American Criminal Law Review, Vol. 60, Is. 4 (2023), available at https://www.law.georgetown.edu/american-criminal-law-review/in-print/volume-60-number-4-fall-2023/drug-induced-homicide-laws-and-false-beliefs-about-drug-distributors-three-myths-that-are-leaving-prosecutors-misinformed/.

[21] *See, e.g.*, *United States v. Carlos Macci*, 1:22-cr-92-RA (SDNY 2022) (Carlos Macci was one of three charged in a conspiracy to distribute fentanyl that resulted in the death of Michael Williams, an actor and struggling addict who starred in The Wire, a widely viewed and critically acclaimed series that critiqued the war on drugs. David Simon, a former Baltimore Sun reporter, co-created The Wire. Simon and others submitted letters to the court to request leniency for Macci. Simon's letter eloquently articulates his thoughts and applies with equal force outside the context of Macci's case. Simon's letter is attached to this memorandum).

14

Hovis is 24 and still an "emerging adult."[22] He has yet to really begin life. He has no history of violence, no serious criminal history, and is determined to continue his path to recovery. He seeks to make amends for the pain and suffering his addiction and actions have caused. He will carry the loss of C.W. for the duration of his life, and he will never regain what he has lost himself.

For all the foregoing reasons, a sentence of 84 to 120 months will provide just punishment for the unintentional death of C.W. and the unintentional harm to C.H. in which Hovis' offense resulted and ensure the sentence this Court imposes is sufficient but not greater than necessary to comply with the remaining purposes of sentencing. Additionally, a sentence within this range will account for Hovis' post-offense rehabilitation.

---

[22] The most recent and perhaps most thorough legal exposition of the reduced culpability of emerging adults comes from the Massachusetts Supreme Court in a lengthy opinion issued earlier this year. Among other things, the court wrote,

> Advancements in scientific research have confirmed what many know well through experience: the brains of emerging adults are not fully mature. Specifically, the scientific record strongly supports the contention that emerging adults have the same core neurological characteristics as juveniles have. As the Superior Court judge noted, 'Today, neuroscientists and behavioral psychologists know significantly more about the structure and function of the brains of [eighteen] through [twenty year olds] than they did [twenty] years ago . . . .' This is the result of years of targeted research and greater access to relatively new and sophisticated brain imaging techniques, such as structural magnetic resonance imaging (sMRI) and functional magnetic resonance imaging (fMRI). From the detailed evidence produced in the record, the judge made four core findings of fact regarding the science of emerging adult brains: emerging adults (1) have a lack of impulse control similar to sixteen and seventeen year olds in emotionally arousing situations, (2) are more prone to risk taking in pursuit of rewards than those under eighteen years and those over twenty-one years, (3) are more susceptible to peer influence than individuals over twenty-one years, and (4) have a greater capacity for change than older individuals due to the plasticity of their brains. The driving forces behind these behavioral differences are the anatomical and physiological differences between the brains of emerging and older adults. These structural and functional differences make emerging adults, like juveniles, 'particularly vulnerable to risk-taking that can lead to poor outcomes.'"

*Commonwealth v. Sheldon Mattis*, 493 Mass. 216, 225; 224 N.E.3d 410, 420-421 (2024) (brackets in the original) (citations omitted).

                        Respectfully submitted,

By:   */s/ Joel J Schwartz*

       Joel J Schwartz, # 39066 MO
       Attorney for Defendant
       120 S. Central Avenue, Suite 130
       Clayton, Missouri 63105
       (314) 862-4332
       jschwartz@rsfjlaw.com

## CERTIFICATE OF SERVICE

I certify that on December 19, 2024, this document was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Ms. Tiffany Becker, Assistant United States Attorney.